The second case of the morning is Callahan v. Sledge, and for the appellant is Mr. Londrigan, for the appellees Mr. Fazar and Mr. Perryman. You may proceed. Thank you, your honor. I first would like to address the problem we've all struggled with for the past three years, and that is that we do not have a clearly written policy of insurance or coverage for state employees in this case. In 19, excuse me, as late as 2006, the Office of Attorney General had an important role in enforcing and delivering health care to state employees. But the primary agency during that period of time was the Department of Children and Family Services and Health Care. In 2006, the defendant, the state defendant, CMS, was made the primary contractor and responsible for all state health care in Illinois. CMS then delegated the health care administration to non-state defendants who were also appellees. And this involves what is sometimes referred to as the health link family. They are venued in the state of Missouri, and although they deny having written the summary plan descriptions that are talked about very often in the briefs and also in the record. I think it was best explained by Kelly Choate when this case was filed in circuit court, and we were trying to put together a record. After the decision that was made by CMS, and after we filed for judicial review. Let me stop there, but before that, did the CMS give you an opportunity to be heard before they made their final decision? No, we requested that a number of times, Judge. We tried to expedite because we had a stage four melanoma case. We wanted to get this resolved so we wouldn't be confronted with a mootness argument, which by the way has been asserted. Well, after it was remanded back by the circuit court, did you present any evidence? Yes. We were only allowed, not to present evidence, but to submit under the statute, the Illinois statute, two peer review articles written for oncologists to give them direction as far as the efficacy and the safety of, in this case, Avastin. Avastin alone and Avastin in combination with others. Prior to that time, we had no opportunity to present evidence. One of the important things, I think, to the court should be that we did not ask for remandment because of the condition of the client and because of the protection that appeared to be in the summary provisions that we were provided of an immediate or expedited hearing within ten days. And this was delayed for almost a year. So when we came back, we were not looking for remandment against CMS. They said quite clearly that what they would do is what they were told to do by the non-state defendants who were acting as administrators of the program. So it was important to us to either get a final decision here or to get a definitive decision where we were allowed the opportunity before abiding to call witnesses, where we would be allowed to present testimony which contradicted the, I don't want to call it secret, but the unnamed expert who had submitted an opinion into the record that we did not see until after it was fait accompli. In other words, things went into this record after the decisions were made, after both decisions were made. There wasn't even a solicitation of an expert witness until after the September 17th decision in 2008. So our whole thrust at that time was to get this thing off the dime. And since we believed that we had been denied the opportunity for a hearing and since we believed this to be a contested case, our relief that we sought based upon the cases that are cited in our brief is that those proceedings were a nullity. That they should not be remanded, but they should be told to comply with their own recommendation of their consulting physician. The problem that the court is confronted with now, and that we were confronted with three or more years ago, was that the summary planned descriptions, which are referred to as capital S, capital P, capital D, summary planned decisions, are not the Illinois Health Care Act. They're statutes. Health Link did not administer a plan that we knew about or that any state employee that opted for that plan could understand because it was not in this record and it was not in their hands. In the period between 2006 and 2008 was a huge game changer as far as what was going on with respect to coverage for state employees. So without notice and without hearing, CMS simply adopted Health Link's coverage denial. Maybe I'm off base a little bit, but are you saying the record shows that you were not given an opportunity to be heard before CMS? Initially, until the first... there are two final decisions. The initial final decision was in September of 2008. We were not given an opportunity, although we requested for a hearing repeatedly and repeatedly tried to expedite this matter so it would not... Well, am I wrong then if I read it to say that the record reflects that you were given a notice and an opportunity to be heard before CMS rendered its decision? Judge, that was the second time around. Is it the same issue? I've got a client that under this contract is entitled to an expedited appeal. Not only were we given a hearing, we weren't given access to any of this material until after we filed for administrative review. Now, what we were told to do after it lingered for another year in the circuit court was to submit articles dated on or before the date of the original hearing, which was September 17, 2008. And we did that. And what the trial court decided was, well, in their words, really didn't recommend. Now, there's a difference in these peer-reviewed medical journals as to their purpose. Their purpose is not to force pharmaceutical indemnity upon health care providers. Their purpose is to initiate a dialogue with treating oncologists so they understand what's happening in these ongoing clinical trials. This all happened a couple of years down the road. We were sent back to the same place from which we had come. We did what we were asked and submitted those journals. They weren't considered the first time around. But when we came back, the decision that the trial judge reached was that these did not really recommend. Well, the recommendation wasn't to the court. It was to practicing oncologists as to what the risk-benefit equation was. In other words, are these people seriously set back in their program when they administer this drug? Are they at risk of dying? Are they at risk of serious bleeding? Have they had good results? If you have a stage 4 cancer, and in this case, at the expense of this family and neighbors and friends, they paid for this very expensive treatment, and the judge comments upon that and the result that he had, which is the equivalent to what was being reported in these medical journals. And his finding was, I'm not allowed to take that into consideration. I guess what we're saying with respect to these drugs, this drug, is that it was medically necessary, based upon his condition, and based upon the evaluation of the treating oncologist that was chosen by the non-state defendants. We were told to go to him, and he became very active in this case. You can see from the letters that were written during the almost year-long period that this was held on advisement at the initial level. And the trial judge mentions that, mentions his credentials. But his interpretation of the law was he could not take that into consideration. Do you agree that the peer reviews did not recommend that treatment for that particular type of cancer? No, I don't, Judge. I believe to a treating oncologist they did recommend its use. They never used the words we recommended? No, they don't. They said further study was necessary? That's right. This was a Phase II study. Phase I study is to determine primarily the risk. Should we go further and have another study? Phase II studies, and there's some literature in there that says that a Phase II study is sufficient to go ahead and administer the drug, and that the person contracted with the doctor is required to make that payment. So the recommendation doesn't go to the court. It doesn't go to the providers. It goes to the treating physicians who are dealing with the program. And I think if you look at it from a health benefit standpoint, at least this doctor who was there treating, at least assigned to this patient, was better off to have it, without regard to the cost. And I think the record reflects that he did benefit, but it was never administered to him subsequently. Over the next two years, he died two years later. None of these pharmaceuticals are magic pills that guarantee a result. Many of them just extend life, maybe a half a year, maybe two years, maybe three years. For instance, this patient had high school children that he wanted to live until, see them graduate. Also provides palliative relief. It's not going to guarantee he's going to live forever. There's no such findings. The question is, at this point in time, during his treatment, was this appropriate, and was it contracted? The defense is, this wasn't medically necessary because it's investigational. Investigational is not a term that is found in these SDSs. It's not in any contract. It's not in an exclusion. The only place you find investigational is in the medical policy, in internal corporate medical policy, of the non-state defendants. The other thing that we had concern for initially is that the state defendants didn't even begin to compile an administrative record until after its final decision in September of 2009. We have a second count here, because these healthcare issues are not moved simply because this patient died. His widow was substituted. There are still things that need to be considered. There are things that need to be cleaned up as far as doctors, payments. In other words, his appeal, when it finally did go ahead, still in limbo. This case needs to be remanded back to the court to clean that up. But in addition, we have filed a count three, which is a count for declaratory judgment. And what we're asking that the trial court declare is whether the Illinois Employees Group Insurance Administration are required to provide notice in due process hearings before denying administrative appeals of medically necessary healthcare. Secondly, we're asking to be remanded to the trial court to have them define under declaratory judgment whether the Illinois Employees Group Insurance, as administrator for healthcare claims of state of Illinois employees, are required to follow contract provisions of an Illinois plan or descriptions that it drafted. Whether this cause and future causes should be remanded to qualified state defendants to determine narrow legal issues and statutory interpretation contract exclusion. None of this is required. None of this is... If CMS is required to afford hearings, do they have to set up courtrooms and have court reporters and have an entire proceeding like courthouses? No. That's certainly not true in most cases. In this type of case, they're required and the auditor general sent them notice that they're required to do this. The type of thing that you said. Not necessarily issuing subpoenas, but if they're going to get an expert witness report and put it in the record and you don't have an opportunity to either cross-examine or present any evidence on the other side, it's a foregone conclusion. They predetermined that this drug would not be used. That's why the doctor went back to them and said, look, this is necessary medical care for this patient. We want an expedited appeal. And that didn't happen. I recognize that in many, many cases that there is no need to go to the extreme that you outlined. But in this case, it is required. And I cite the court to the O'Rourke case, which predated this. O'Rourke was talking about a dangerous or high-risk medical device. And this is while the Department of Insurance was still involved in monitoring these cases. And in that case, you'll have additional time on a rebuttal. Thank you. All right. You've split your time, is that correct, Mr. Rizzo? Yes. And Mr. Ferguson will be taking the last five minutes. You may proceed. May it please the Court, Counsel. I am Assistant Attorney General Richard Huzzack, Counsel for the State Defendants, and that is the Department of Central Management Services and its Director, James Sledge. And I would urge the Court to affirm the decision that the requested treatment for malignant melanoma with avastin and two chemotherapy agents, taxol and carboplatin, was not required. The coverage was not provided either under Section 4 of the Group Insurance Act, which sets forth the standards under which such coverage must be provided, or under the medical benefits plan that was obtained from the Health Link administrator among the various selections for state employees that has a specific exclusion that was invoked for experimental investigative procedures. Well, I think we understand the process of how those decisions get made, whether they're allowed or denied. But my question is, you've got a very ill person, and why are we drawing these proceedings out for such a long period of time? The CMS procedure, I just want to clarify, went quite quickly. There was an initial processing back and forth at the administrator stage, which is subject to appeal ultimately to CMS. I think part of the misunderstanding here is that the plaintiff treated this issue as being one of a medical necessity determination, and in essence it was an administrative determination. It was an application of the exclusion provisions of the plan. The plan documents make it clear that there are two different types of decisions, and the ones that are essentially contract interpretation decisions are not subject to an expedited review procedure. The medical necessity ones are subject to an expedited review procedure, but this wasn't in essence a medical necessity decision. It's perhaps a truism that something that is experimental or investigative cannot be also deemed medically necessary. But the two are to a certain extent distinct, even though the category of experimental procedures creates a carve-out for medical necessity. I don't think anybody is unsympathetic to the human circumstances here, but the characterization, I believe, in the plaintiff's brief about some endless runaround is inconsistent with the record. The requests were submitted. There was an opportunity for additional internal review at the Health Link level. I don't know if Mr. Perryman can describe more accurately and completely that chronology. But there was prompt response. The difficulty here is not so much that there was a disagreement at all about the diagnosis. Malignant melanoma, stage 4 cancer, nobody disputed that that was the case. Health Link had provided coverage when there was the first diagnosis of melanoma, the operations, subsequent procedures. Then after the remission, when the cancer returned, there was again coverage provided for all of the standard recognized protocols in the medical field for the treatment of that. Unfortunately, those treatments don't have a great track record of prolonging life, much less, I think as Mr. Lonergan indicated, curing the disease. And when the ones that had been proved to be effective under established medical research standards had run their course, the plaintiff's doctor, Dr. Lunette, who was at the time running a clinical trial for this very regimen, the Avastin with these two other chemotherapy agents, had run out of options. And he said, not, and I think this is important to clarify because the plaintiff's brief gives an inaccurate description of this. He did not say that this regimen was proven to be safe and effective. He said that it was the plaintiff's best option. He added that in patients that he had been treating on clinical trial and off clinical trial for some period had shown a clear response.  that both the statute and the plan make a condition for a treatment to be covered. We live in a world where, as I think Mr. Lonergan's brief accurately describes, much of the cancer care in this country is not FDA approved for the specific cancer that's involved. And that's what's known as off-label treatment. There is a universe of treatment that is practiced and is generally accepted practice by oncologists that consists of off-label treatment. Let me just briefly define that in case any member of the court doesn't understand it. That's a drug that's been approved or a treatment that's been approved by the FDA for some disease or condition, but a doctor is at liberty legally to prescribe it for another condition for which it hasn't been approved by the FDA as safe and effective. Doctors do this on a regular basis. So just because it's not FDA approved for a certain condition doesn't mean that it isn't covered. But the flip side is also true. Just because a doctor prescribes an off-label treatment doesn't mean that it is covered. And really we're in this middle zone where I think Section 6.4 of the Group Insurance Act has established a set of standards that are clear, that can be articulated and can be applied and leads to decide much of the hand-wringing and teeth-gnashing about whether a particular prescription of an off-label drug will be covered. And there are three ways to satisfy Section 6.4. Either it is FDA approved, in which case it's covered, or it's one of the listed treatments on the enumerated compendia or formulary and the National Cancer Comprehensive Network guidelines are probably one of the ones that are most recognized. And Dr. Lynette, the plaintiff's doctor, in fact, had referred to those guidelines. But it was not on there, the treatment that he was prescribing here. And then finally, the legislature has said, but even if you don't meet either of those standards, you can still get coverage and it has to be provided under one of these state plans if it has been recommended in two formal clinical studies, the results of which have been published in peer-reviewed medical journals in this country or in Great Britain. And I understand that the word recommended isn't perhaps the term that these studies use. They're medical researchers, they're not legislators. But recommended, I think, is fairly understood to mean that the results of the study show that the treatment is effective for what it was intended to do. It's better than a placebo, it's at least as good as the alternative treatments. That means, you know, progression-free survival extension, life extension. Those are the standards that are used in these studies to determine whether a particular treatment is effective. And that was what we were looking for here, was any study that was peer-reviewed of a formal clinical study that showed that that was the case. But you weren't allowed to consider studies that were done after the hearing or after a certain point in time? Well, the decision was made. The decision was made based upon the material. If there was a study a month ago, why shouldn't we consider it today? You know, I suppose that's a good question, but it sort of has to do with the fact that courts can't freeze time. And ultimately, if a decision is made by CMS based upon the standards that apply to that decision, then normally you don't get to sort of reopen it with new evidence that wasn't presented at the time the decision was made. And I want to sort of tread on this issue very delicately. CMS's job is not to predict the future of medical research. Their job is not to say, we predict that future research will show that this treatment is effective. They have to make a decision on whether the risk coverage or not based upon this standard. And it's not whether they predict that the treatment will be effective. It's whether the established research shows that it is established to be effective. And that's different. It takes them out of the game of trying to be researchers. Well, one of the questions here, I think, is, is the family going to be reimbursed by CMS for the expense of this medicine? That is not a moot issue. We agree that of the declaratory judgment and other issues, that one is not moot. And so this is a live question. Why shouldn't we make the best decision we possibly can on that? Well, I think administrative review is a decision limited to the administrative record. And I will add this, is that even though the circuit court said, after CMS made its decision, you know, I'm going to remand for you to submit any evidence, you know, from before that decision was made to show that this test was satisfied, that the treatment was proved to be effective, not just showed to be promising by some preliminary studies. And the plaintiff disregarded that limitation. They added all sorts of post-decision studies. And I will point out that it's significant that they omitted to include Dr. Lynette's own study that he was running at the same time that the plaintiff could not get into. I assume it's because that study was closed, that had more than 200 patients in a randomized, double-blind, controlled placebo alternative versus the actual treatment system. And that study, which they didn't submit, shows that the treatment isn't effective. Now, this would be a harder case. Is that correct? I attached it to the appendix in my brief. They carefully did not put it in the record. But none of the things that they did put in the record... The trial court never saw it? The trial court never saw it. But they were submitting all sorts of stuff to the trial court that was beyond what the administrative agency, CMS, saw. There's a point in time at which the clock strikes 12, the agency has to make a decision, and it makes a decision on the record before it. And the plaintiff was in the position of saying, well, we'll submit post-decision information that favors us, although it still didn't get them over the hurdle, but we'll exclude information that shows the opposite of what we're trying to prove. Can we consider the fact the medicine benefited the patient in this case? I don't think that's been established by the record. I think the doctor showed clear response, but there's no indication that the medicine prolonged his survival, showed a progression-free period in which the disease was prevented from bringing to an onset. Is it that there's some assertion that the spread of the cancer was arrested upon administration of this medicine? The doctor did say that he had seen that there appeared to be no new nose during this, I guess, two-week period or three-week period when they were administering the disease. But a single person with anecdotal evidence of that variety, unfortunately, I think under the scientific standards that the statute requires and that the plan requires, isn't enough to establish effectiveness according to the relevant criteria. And the relevant criteria are, you know, has this method been shown to prolong your life under the scientific standards that apply to this type of medical treatment? Otherwise, we would be in the situation where, contrary to the public policy prescribed by the legislature, that medical benefits plans aren't paying for established treatments as part of their coverage. They're paying to fund research for all sorts of things that aren't established. And I think that's sort of a heartbreaking line for a lot of people to accept. But it's one that ultimately the taxpayers and their legislators, acting through their responsive agencies, have said that that is what the state's responsibility is. Let me take a somewhat absurd example. We all laugh about doctors prescribing leeches in the 17th century and stuff like that. But leeches are, again, FDA approved for regenerative surgery and for skin cramps. They pull the blood through the blood vessels and they help regenerative surgery where somebody has lost a finger and doctors reattach it and they want to get the blood flowing again. But that doesn't mean that if a doctor prescribes leeches for migraines, that automatically that CMS has to cover it or has to approve coverage for it. It may be FDA approved, but not for this. And there's no established medical research that shows that it's effective for that type of treatment. That's what we have here. We have a doctor saying this is the best option. But there are no good options. The heartbreaking truth is that there are no good options for malignant melanoma. It is one of the least treatable forms of cancer. And we can't change that. The court can't change that. And if the decision was made based upon the record that was submitted, that the standards under Section 6.4 to publish, you know, peer-reviewed clinical studies showing that it's effective, that wasn't met. And the provision of the plan, which they have discretion to make determinations under, it's an experimental treatment. Then it's their responsibility to apply those provisions and say that there is no such coverage. And the fact that Dr. Lynette, at the same time, was doing this regimen in a clinical study that he was conducting, that is in the record, that tends to establish that it was experimental, as opposed to being confirmed to be proven safe and effective. And I do want to respond to the comment that there was no opportunity to submit evidence to CMS on this. As soon as the appeal was taken to CMS, CMS sent the plaintiff a letter saying, Send us everything you've got. Send us all the evidence that you have to show that this treatment meets the criteria for coverage. We will consider it. They immediately sent a note to HealthLynx saying essentially, Send us your entire file, all emails, all records that were submitted by the plaintiff. We need to make a decision as to whether this satisfies the coverage criteria. And they did that promptly. To say that there would have been a need for testimony in a courtroom-type trial ignores the fact that all of the evidence that would have been relevant to support coverage was available, it was submitted by the plaintiff, and it failed to establish that standard. Thank you. Your time is up. Thank you. Kindly, you're hearing up. Mr. Perring. Please support. My name is Neil Perring, and I represent what's been called the non-state defendants in this matter, HealthLynx HMO, HealthLynx Inc., and the WellPoint companies. I want to address a couple of issues that address why my clients are involved in this case at all. Count one, it was for administrative review. It was asserted against CMS, the director. Count three was alleged against them and also my clients. HealthLynx HMO, Inc. administers this particular State of Illinois plan, but the administrative review law provides the exclusive remedy in a case such as this. We cited that case law to the trial court. The court ultimately concluded that count three was improper and dismissed us from the claim. In the plaintiff's opening brief, there's not a single case cited to explain why the legion of authority that explains that administrative review as the exclusive remedy was inappropriate. We responded in February of last year citing many of the same cases, including Emerald Casino and the Morazzo's case, which explained very clearly that administrative review supplants all other common law and statutory remedies. The Morazzo's case clearly applies to due process type claims and holds that whether due process was granted, even at a constitutional level, is inherent in the administrative review proceeding and can be considered there. So we don't believe we should be here. We don't believe we should have been in the trial court. We believe we were properly dismissed. We ask that the court affirm. I do want to address the court's question of the Attorney General. Page 23 through 24 of our brief, we explain HealthLynx's responses to the request of the plaintiff for information. Mr. Buzza is correct that there is no right to a predetermination of an exclusion under the plan. This is at page 38 of the record. In order to seek an appeal, you have to have a denied claim. The first time there was a denied claim that was submitted to HealthLynx was July 6, 2009, in a letter dated June 23. There's no allegation. There's nothing in the record that suggests that wasn't promptly dealt with, considered investigational, and they went on to CMS and then off to court. So our responses are clear. We timely responded. There was no right to a predetermination of an administrative exclusion, and we believe the court should affirm the trial court's decision in all respects. Thank you. Thank you. Mr. Ryder, do you have a rebuttal? Yes. Your Honor, it's always easier to pick up on the last argument that was made. These were the administrators of this program. They were to apply Illinois law. They merely have an obligation to make a recommendation to the state of Illinois, and if you take the time later to look at what that initial denial said, was that we were denying this because we were told to deny it. This was indeed the administrator. There was no one to my knowledge at CMS who had the knowledge of children and family service and health care with the help and assistance of the Attorney General. They made the decision, and they're responsible for the delay. We pleaded with them over and over again to put this in the lap of the ultimate decider. They did not. When they did it, the only information we had is that we're following the recommendation of our administrator. There was no administrative record. Despite all the requests, there was no hearing. And with regard to the out-of-state defendant, we would get these robotic responses to our pleas. Both the doctor and when we got involved, the lawyers, saying we're conducting an investigation here. We'll let you know later. And then we get a stylized or rubber-stamped signature. We got four of those during the period of time we were asking for a final decision. In this, what we were given is summary plan descriptions. It said, go to your doctor that we've provided you. He'll do everything for you. You won't even have to do anything yourself. Well, what happened is the doctor understood what this program meant. He understood he was entitled to an expedited appeal if he was representing a client that he thought needed immediate attention. Under an expedited appeal for medical necessity, they've got to make a decision and make a recommendation to the state. What about the argument that this is not a technical medical necessity? This is a question of interpretation of the statute or the rule? There are two issues. One is the coverage issue and the other is the contracted benefit that the people who signed on to this program thought that they were going to receive. With respect to the contract exclusion, they're relying on a one-term. This isn't an experimental. The language throughout that applies to here is investigational. And that's found only in their medical policy. In other words, their internal, acting as an insurer and an administrator, list the ones they're going to pay for. And the ones that they aren't going to pay for, they say, this is an exclusion. And what was the exclusion term they used? It was investigational. That's not in the SPDs we were given. It's not in the record. The term that's used in the exclusion is investigative. And that's why we get into the whole problem of conflict and ambiguity. I've spent many, many hours, as have counsel, briefing this at different levels. And there was no administrative hearings at any level. This was a predetermination that they were not going to pay for this expensive drug to anybody. However, it's not only been approved as a cancer drug, it's approved for 11 other cancers. All I'm saying is we have a limited amount of time here. And I've done my best to address all these issues and sub-issues in a brief. And unless the court has further questions, I hope you do, I've concluded. Thank you. We'll take this matter under advisement and stand in recess until the readiness of the next case.